UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

COLUMBIA CASUALTY COMPANY            :
                                     :
              v.                     :        C.A. No. 15-197ML
                                     :
IRONSHORE SPECIALTY INSURANCE        :
COMPANY                              :

## REPORT AND RECOMMENDATION

Lincoln D. Almond, United States Magistrate Judge

Pending before me for a report and recommendation (28 U.S.C. § 636(b)(1)(B)) is Plaintiff Columbia Casualty Company's ("Columbia") Motion to Dismiss Defendant Ironshore Specialty Insurance Company's ("Ironshore") Counterclaims.  (Document No. 16).  Ironshore opposes the Motion.  (Document No. 20).  A hearing was held on November 9, 2015.

### Background

Columbia initiated this action with a Complaint for Declaratory Judgment.  (Document No. 1). Columbia seeks declaratory relief "for the purpose of determining the rights and obligations of the Parties pertaining to the funding of a settlement of a lawsuit involving Rhode Island Hospital, which is a mutual insured of the Parties, in an action entitled Beauchamp v. Rhode Island Hospital, et al., Civil Action No. PC12-2874, Superior Ct. for Providence, Rhode Island."  Id. at ¶ 1.

Columbia seeks a declaration that it breached no obligation to Ironshore with respect to the Beauchamp case, and has no obligation to pay Ironshore's share of the "settlement."  Id. at ¶ 12. Ironshore answered and asserted four counterclaims against Columbia.  (Document No. 14).  In particular, Ironshore asserts counterclaims against Columbia for common law and statutory bad faith (Counts I and II) and breach of fiduciary obligation (Count III) as the contractual and equitable

subrogee of their mutual insured Rhode Island Hospital.  Id.  Ironshore also brings a counterclaim directly against Columbia for breach of Ironshore's alleged duty of good faith and fair dealing (Count IV) owed to Ironshore, as a second layer excess insurer.  Id.

**Standard of Review**

In ruling on a motion to dismiss counterclaims filed pursuant to Rule 12(b)(6), the Court construes the counterclaims in the light most favorable to the counterclaim plaintiff, see Greater Providence MRI Ltd. P'ship v. Med. Imaging Network of S. New England, Inc., 32 F. Supp. 2d 491, 493 (D.R.I. 1998); Paradis v. Aetna Cas. & Sur. Co., 796 F. Supp. 59, 61 (D.R.I. 1992), taking all well-pleaded allegations as true and giving the counterclaim plaintiff the benefit of all reasonable inferences, see Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 18 (1st Cir. 2002); Carreiro v. Rhodes Gill & Co., 68 F.3d 1443, 1446 (1st Cir. 1995); Negron-Gaztambide v. Hernandez-Torres, 35 F.3d 25, 27 (1st Cir. 1994).  If under any theory the allegations are sufficient to state a cause of action in accordance with the law, the motion to dismiss must be denied.  See Hart v. Mazur, 903 F. Supp. 277, 279 (D.R.I. 1995).  While a counterclaim plaintiff need not plead factual allegations in great detail, the allegations must be sufficiently precise to raise a right to relief beyond mere speculation.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) (abrogating the "no set of facts" rule of Conley v. Gibson, 355 U.S. 41, 44-45 (1957)).  The counterclaim "must allege 'a plausible entitlement to relief' in order to survive a motion to dismiss."  Thomas v. Rhode Island, 542 F.3d 944, 948 (1st Cir. 2008) (quoting Twombly, 550 U.S. at 559).

**Facts**

The following facts are gleaned from Ironshore's Counterclaim and must be accepted as true for purposes of this Motion.

The Beauchamp case was filed in 2012 against Rhode Island Hospital.  It alleged that the Hospital was negligent in diagnosing and treating Mr. Beauchamp in 2009 resulting in a severe and permanent brain injury.  During the relevant period, the Hospital was a member of the Lifespan[1] network and insured under three layers of insurance with total coverage of $32,000,000.  Lifespan self-insured the first $6,000,000 layer of coverage.  Columbia provided the next "excess" $15,000,000 layer of coverage and Ironshore provide the second "excess" $11,000,000 layer of coverage.

From an early stage, the Hospital's defense counsel in the Beauchamp case opined that a plaintiffs' verdict in excess of the Hospital's $6,000,000 self-insured limits was likely.  In a report dated June 12, 2014, defense counsel informed Columbia that "it will likely take more than $7 million to settle the case."  (Document No. 14 at ¶ 20).  Shortly thereafter, the Beauchamps' attorney demanded the full policy limits of $32,000,000 to settle the case.

A mediation was held in early 2015.  The Hospital offered the remainder of its self-insured layer (approximately $5,750,000 after deducting defense costs) and Columbia offered an additional $500,000.00 of its $15,000,000 policy.  The Beauchamps made a reduced demand of $31,475,000. Prior to an April 1, 2015 pretrial conference, Columbia directed defense counsel to concede liability and causation.  Thus, the sole issue for trial would be the measure of damages.  Defense counsel subsequently opined that the case could be settled for approximately $15,000,000 but Columbia failed to authorize more than $500,000.00 of its policy limit.  On April 6, 2015, two weeks prior to the scheduled start of the Beauchamp trial, defense counsel opined that the jury verdict range plus interest would be approximately $19,000,000 to $27,900,000.  Columbia refused to offer more than $1,250,000 of its policy limit for a total offer of approximately $7,000,000 which was not accepted.

---

[1]  The Hospital and Lifespan are collectively referred to as the "Hospital" herein.

As trial approached, Ironshore demanded that Columbia satisfy its duty of good faith by settling the Beauchamp case within Columbia's policy limits and warned of the risk of reputational harm to the Hospital that would result from a significant verdict.

The case proceeded to jury selection. On the second day, Columbia made a final settlement offer of $15,000,000 which included the approximately $5,500,000 remaining in the self-insured layer and approximately $9,500,000 of the $15,000,000 Columbia policy. The offer was rejected, and the Beauchamps "continued to demand $25 million in settlement." Id. at ¶ 30.

Trial commenced on April 22, 2015. After the first day of evidence, the insurers participated in a conference call with defense counsel who "advised again that the Hospital's damages exposure in this case exceeded $21 million." Id. at ¶ 34. Columbia refused to increase its offer and requested that Ironshore "drop down" to make a contribution toward a settlement that would otherwise fall within Columbia's layer of coverage. Id. Columbia also refused to authorize defense counsel to contact the Beauchamps' counsel to explore a possible "mid-point" settlement in the $20,000,000 range. Id.

Instead of pursuing settlement negotiations that would avert a jury verdict, Columbia pursued a "high/low" agreement with the Beauchamps' counsel which, in its final form, provided for a minimum recovery of $15,000,000, the amount of Columbia's final offer, and a maximum recovery of $31,500,000, the total remaining policy limits. The "high/low" agreement provided Columbia with the potential to save $6,000,000 from its $15,000,000 layer of coverage.

On April 24, 2015, Ironshore and Lifespan advised Columbia that the "high/low" agreement did not fully protect the Hospital because it would be the subject of negative media attention with a verdict, and Ironshore's $11,000,000 limit for the relevant year of account would be "unnecessarily exhausted." Id. at ¶ 36. On April 26, 2015, Ironshore and Lifespan contacted the Beauchamps'

counsel seeking to negotiate a settlement for $25,000,000.  Because Columbia refused to contribute its policy limits, the case did not settle.

On April 29, 2015, the jury returned a verdict awarding the Beauchamps $25,590,000 before prejudgment interest.  It was the largest negligence verdict ever in Rhode Island and generated negative publicity for the Hospital.  With the addition of interest, the verdict exceeded the agreed $31,500,000 high-end recovery.  Because the Hospital's $6,000,000 self-insured coverage had been eroded by defense costs, Columbia was liable for $15,022,423, and Ironshore was liable for $11,011,044.00 of the $31,500,000 due to the Beauchamps.  Thus, the verdict and resulting judgment fully exhausted the Hospital's insurance coverage, including Ironshore's $11,000,000 second-layer excess policy for the relevant policy year.

### Discussion

Columbia mounts four attacks on Ironshore's Counterclaims.  First, it argues that the high/low "settlement agreement" bars all bad faith claims.  Second, it argues that Ironshore's statutory bad faith claim (Count II) supplants the common-law, bad faith claims as duplicative (Counts I and III).  Third, it argues that Ironshore lacks standing to bring a statutory bad faith claim since it was not Columbia's "insured."  Finally, it argues that Ironshore's "direct" bad faith claim (Count IV) fails because Columbia does not owe any independent duty of good faith to Ironshore under Rhode Island law as a fellow excess insurer.  Each argument will be addressed in turn.

### A.        The High/Low Agreement

Columbia argues that the high/low agreement absolutely protected the insured (the Hospital) from an uninsured excess judgment and thus extinguished any bad faith claims by operation of law.[2]

---

[2]  At the hearing, Columbia's counsel made clear that Columbia was not arguing that the high/low agreement acted as a release or waiver of bad faith claims.

Ironshore disagrees and argues that "[i]n proposing the [high/low] agreement, Columbia chose to gamble with Ironshore's money, at the risk of its insured's reputation, rather than pay up to its policy limit to settle the Beauchamp case."  (Document No. 20 at p. 13).

Neither side cites any Rhode Island precedent directly addressing this issue in the context of a high/low agreement.  In 1980, the Rhode Island Supreme Court joined a growing number of jurisdictions and recognized a common law cause of action in tort for an insurer's bad faith refusal to settle an insurance claim.  Bibeault v. Hanover Ins. Co., 417 A.2d 313 (R.I. 1980) (finding that the duty of an insurer to deal fairly and in good faith with an insured was implied by law).[3]  In Asermely v. Allstate Ins. Co., 728 A.2d 461, 464 (R.I. 1999), the Rhode Island Supreme Court described the insurer's duty as "a fiduciary obligation to act in the best interests of the insured" and noted that the duty extends "to a party to whom the insureds have assigned their rights."  Finally, it held that the duty requires an insurer to "refrain from acts that demonstrate greater concern for the insurer's monetary interest than the financial risk attendant to the insured's situation.'" Id. (quoting Med. Malpractice Joint Underwriting Assoc. of R.I. v. Rhode Island Insurers' Insolvency Fund, 703 A.2d 1097, 1102 (R.I. 1997)).

In West Am. Ins. Co. v. RLI Ins. Co., 698 F.3d 1069 (8th Cir. 2012) (applying Kansas law), the Eighth Circuit relied upon these same policy concerns to reject the argument presented here by Columbia that a bad faith claim is precluded when the insured is protected from an uninsured excess judgment by a high/low agreement.  First, the Court in West declared that it was "sophistry to posit" that the primary insurer protected the insured through the high/low agreement from the risk created by the insurer's failure to settle within its policy limits.  Id. at p. 1076.  It reasoned that the insured

_____

[3]  In 1981, Rhode Island enacted Section 9-1-33 which created a statutory bad faith claim.  R.I. Gen. Laws § 9-1-33.

actually protected himself by purchasing an excess liability insurance policy.  Id.  Second, the Court in West reasonably predicted that the Supreme Court of Kansas "would follow nearly every other jurisdiction[4] and hold that [the excess insurer] as subrogee could sue [the primary insurer] for [its] liability as excess insurer, even though [the insured] had no personal exposure because of the excess policy coverage."  Id. at p. 1076.

Finally, the Court in West recognized that "the conflict-of-interest concerns underlying the duty of primary insurers to exercise good faith and due care in evaluating settlement offers are not diminished when the insured is also protected by excess insurance."  Id. (citing Twin City Fire Ins. Co. v. Country Mut. Ins. Co., 23 F.3d 1175, 1179 (7th Cir. 1994)).  It reasoned that "[w]hen the primary insurer is faced with a settlement offer at or near its policy limits, it has the same incentive to gamble with someone else's money, either the insured's or the excess insurer's" and that permitting subrogation claims for bad faith in these circumstances "increases the likelihood of fair and efficient settlement of lawsuits, reducing the premiums charged for excess insurance without increasing the good faith duties of the primary insurer."  Id. (citing Certain Underwriters of Lloyd's v. Gen. Accident Ins. Co. of Am., 909 F.2d 228, 232 (7th Cir. 1990)).  Thus, the Court in West permitted the excess insurer to step into the shoes of the insured and assert his "implied contractual right against the misbehaving insurer."  Id. at p. 1077.

---

[4] See, e.g., St. Paul Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co., 353 P.3d 991 (Haw. 2015) (answering question certified to it by the District of Hawaii – see 2014 WL 1330855 (D. Haw. March 31, 2014)).  In St.Paul, the Hawaii Supreme Court followed the majority rule and held that an excess insurer can bring a claim, under the doctrine of equitable subrogation, against a primary insurer who in bad faith fails to settle a claim within its policy limits.  It reasoned that permitting such a claim "protects the public interest in ensuring equity in insurance matters and encouraging settlement" and "enables an excess insurer to seek relief from a primary insurer who can otherwise take advantage of a situation that leaves the excess insurer with no other remedy."  353 P.3d at 994, 997.

I find the Eighth Circuit's decision in <u>West</u> to be well-reasoned, persuasive and fully consistent with the policy rationale expressed by the Rhode Island Supreme Court in recognizing an insurer's duty of good faith to its insured.  Here, Ironshore plainly alleges that Columbia utilized the high/low agreement to gamble with Ironshore's money, at the risk of injuring its insured's reputation and exhausting its final layer of insurance coverage, rather than diligently attempting to settle the <u>Beauchamp</u> case within its policy limit.  Thus, I recommend that this Court follow <u>West</u> and find that Ironshore has adequately stated a bad faith claim against Columbia as the assignee/subrogee[5] of the Hospital, their mutual insured.

### B.     The Statutory Bad Faith Claim

In its Second Counterclaim (Count II), Ironshore brings a statutory bad faith claim as the contractual and equitable subrogee of the Hospital.  Ironshore invokes R.I. Gen. Laws § 9-1-33(a) which provides that an insured may bring an action against its insurer for wrongfully and in bad faith refusing to pay or settle a claim.  Columbia makes two arguments as to Count II.  First, it argues that Rhode Island's statutory codification of an insurer's bad faith claim in § 9-1-33 has supplanted any common law bad faith claims and thus Count I must be dismissed.  Second, Columbia argues that only an insured can sue under § 9-1-33 and that Ironshore lacks standing in the absence of an express written assignment.  Thus, it argues that Count II must be dismissed as well.

Taking these arguments in reverse order, the latter is easily dispatched.  Here, in addition to alleging that it is the Hospital's contractual and equitable subrogee, Ironshore expressly alleges that

---

[5] Ironshore alleges that it is both contractually and equitably subrogated to the rights of its insured and additionally is an assignee of such rights.  The Ironshore Policy provides in relevant part that "[i]n the event of any payment under this Policy, [Ironshore] will be subrogated to all the Insured's rights of recovery against any person or entity, and the Insured shall execute and deliver all instruments and papers and do whatever else is necessary to secure such rights."  (Document No. 14 at p. 15).  Pursuant to this provision, the Hospital executed a contractual assignment to Ironshore of its claims against Columbia arising out of the <u>Beauchamp</u> case.  (See Document No. 20-3 at pp. 2-3).

the Hospital is its "assignor" (Document No. 14 at p. 4) and has attached a copy of the contractual assignment as an Exhibit to its Opposition.  (Document No. 20-3 at pp. 2-3).  Further, the Rhode Island Supreme Court has made clear that an insurer's duty of good faith is subject to assignment.  See Asermely, 728 A.2d at 464.  Accordingly, Ironshore, as the assignee[6] of the insured, has standing to pursue a statutory bad faith claim against Columbia under § 9-1-33(a).

The former argument is less clear cut.  In Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 378 (1st Cir. 1991), the First Circuit concluded at the time that it was "clear that Rhode Island's enactment of a statutory cause of action for insurer bad faith codified, and thus supplanted, the common law action."  Unfortunately, the Rhode Island Supreme Court has never made any clear pronouncement affirming that conclusion or clarifying the ongoing viability of a parallel claim for common law bad faith.  In Robertson Shephens, Inc. v. Chubb Corp., 473 F. Supp. 2d 265, 271-272 (D.R.I. 2007), this Court refused to follow Borden because subsequent holdings of the Rhode Island Supreme Court had muddied the waters.  In particular, the Court observed that since Borden was decided, the Rhode Island Supreme Court, invoking Bibeault, had reviewed claims of common law bad faith, if only to reject them on the merits, without any suggestion they were not legally viable in the first instance.  Id. at p. 272 (citing Zarrella v. Minn. Mut. Life Ins. Co., 824 A.2d 1249, 1261 (R.I. 2003)).  The Court concluded that "[a]dmittedly, the relationship between statutory and common law bad faith is not well defined, but at the very least these subsequent cases connote the latter's continued vitality."  Id.  The Rhode Island Supreme Court has not altered the landscape on this issue since this Court's decision in Robertson Stephens.  Thus, I recommend that its reasoning

---

[6] Columbia argues for various reasons that the assignment is "invalid."  (Document No. 21 at pp. 16-21).  However, that is a factual issue not properly presented in a Rule 12(b)(6) motion to dismiss.

be followed and that Columbia's argument that any claim of insurer bad faith in Rhode Island can only be brought under § 9-1-33 be rejected.

### C.    Breach of Fiduciary Obligation

In Count III of its Counterclaim, Ironshore alternatively pleads its Count I common law bad faith claim as one for breach of fiduciary obligation.  Columbia argues that Count III is duplicative of Count I and should be dismissed.  Ironshore contends that Count III states a separate and distinct cause of action and contends that "[i]n the unlikely event it is not found liable for bad faith, Columbia's conduct may still subject it to liability for its fiduciary breach of placing its interest above the interests of [its insured]."  (Document No. 20 at p. 19).

Ironshore's argument is unconvincing and unsupported.  First, it is clear that Count I and III seek to hold Columbia liable for breaching the same legal duty on the same facts.  It is clearly duplicative.  Although Ironshore uses a different label for the allegedly infringed legal duty, the labels used in Counts I and III are effectively interchangeable in this context.  For instance, in Asermely, the Rhode Island Supreme Court described an insurer's duty of good faith as "a fiduciary obligation to act in the best interests of the insured."  728 A.2d at 464 (emphasis added).  Since Count III is duplicative of Count I, I recommend that it be dismissed for sake of clarity and simplification of the pleadings.

### D.    Breach of Direct Duty to Ironshore

In Count IV, Ironshore alleges that Columbia directly owed it an insurer-to-insurer duty of good faith and fair dealing in its handling of the Beauchamp case.  Columbia moves to dismiss because "no Rhode Island court has ever held that a primary...insurer owes a direct duty to an excess insurer of a mutual insured" and that "the vast majority of jurisdictions" have declined to recognize

such a duty. (Document No. 16-1 at p. 6). Ironshore does not dispute the substance of Columbia's argument on either point. However, it argues that there is a sufficient basis in Rhode Island law for this Court to "predict" the recognition of such a claim or, in the alternative, that the Court could exercise its discretion to certify the question to the Rhode Island Supreme Court. I respectfully decline both invitations and recommend that Count IV be dismissed.

First, Ironshore has pointed to nothing under Rhode Island law suggesting that Rhode Island would adopt the minority rule and recognize a direct insurer-to-insurer action under these circumstances. Second, in <u>Bibeault</u>, the Rhode Island Supreme Court held that an insurer's duty to deal fairly and in good faith with its insured "sounds in contract as well as in tort" and that the availability of tort damages was necessary to level the playing field between insurer and insured. 417 A.2d at 318-319. Here, there is no contractual privity between the parties and no unequal bargaining power. Further, in enacting § 9-1-33, the Rhode Island General Assembly limited a statutory bad faith claim to one brought by an "insured under any insurance policy" against "the insurer issuing the policy." Thus, the claim is rooted in contract and the Rhode Island Supreme Court has rejected attempts to broaden § 9-1-33(a)'s cause of action beyond the insured/insurer relationship. <u>See</u> <u>e.g.</u>, <u>Richard v. Blue Cross & Blue Shield</u>, 604 A.2d 1260, 1262 (R.I. 1992) (holding that health-care provider was not an insurer within the meaning of § 9-1-33); <u>LeFranc v. Amica Mut. Ins. Co.</u>, 594 A.2d 382, 385 (R.I. 1991) (holding that the language of § 9-1-33 applies only to insurers and not to the insurer's employees); <u>see also</u> <u>Cianci v. Nationwide Ins. Co.</u>, 659 A.2d 662, 666 (R.I. 1995) ("We believe that the Legislature, in explicitly restricting the right to sue for a bad-faith refusal to pay a claim to an 'insured,' intended § 9-1-33 to apply only to those claimants who meet 'the technical insurance-contract meaning' of the term.").

**Conclusion**

For the foregoing reasons, I recommend that Columbia's Motion to Dismiss Ironshore's Counterclaims (Document No. 16) be GRANTED as to Counts III and IV and DENIED as to Counts I and II.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


  /s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
November 24, 2015